UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,

                              Case No. 21-20746

v.                               Hon. Gershwin A. Drain

D-1 Ricardo Martinez, and
D-2 Dwight Rashad

          Defendants.

_____/

**United States' Response to Defendant Rashad's Motion to Suppress**

    On November 21, 2019, Michigan State Police (MSP) stopped defendant Dwight Rashad and his passenger, co-defendant Ricardo Martinez, at the direction of the Drug Enforcement Administration (DEA) while they were driving a third-party's pickup truck. DEA agents in Phoenix, Arizona, had been listening to court-authorized phone intercepts for five months, which captured Martinez, among others, discussing drug and money transactions. Over the three days leading up to the stop, Martinez and his handler discussed the logistics of delivering "two-eighty-five" in drug proceeds, how they would use the well-known token system to confirm that Martinez was meeting the designated courier, and that Martinez would have a companion with him. Just minutes before the stop, DEA agents heard

Martinez confirm that he was headed to meet the courier and they watched him carry a bag to the third-party's F-150, along with Rashad. The agents then requested MSP Trooper David Bellestri and his K-9, Rex, to stop the vehicle, which he did after seeing it run a red light. After routine questioning of Rashad and Martinez and Rex's alert on a bag in the vehicle, Trooper Bellestri found approximately $285,000 in bundled suspected drug proceeds.

Trooper Bellestri had probable cause to stop Rashad after seeing a traffic violation. That aside, he was justified in acting on reasonable suspicion supplied by law enforcement's collective knowledge from the totality of their investigation and observations that the F-150 would contain evidence of a crime. Trooper Bellestri's subsequent questioning of Rashad was not a custodial interrogation and did not violate either the Sixth Amendment to the Constitution or *Miranda*. His motion should be denied.

I.   **Facts and Background**

For much of 2019, DEA agents in Arizona were investigating a drug trafficking organization in the Phoenix area. Starting in May 2019, DEA Phoenix agents obtained authorization from a Maricopa County (Arizona) Superior Court Judge to intercept wire communications of several targets, followed by several renewals and spin-offs from that initial order, which by November 2019 included a phone number used by a target identified as "Pacorro." Intercepted calls and

surveillance in Arizona showed that Pacorro was coordinating drug shipments and collection of drug proceeds.

On November 18, 2019, DEA Phoenix intercepted several such calls involving Pacorro. First, Pacorro received a call from "Carlos," the suspected source of supply of drugs for this organization, during which they discussed an upcoming transaction. Carlos instructed Pacorro to call his (Pacorro's) associate and have him set aside "two-eighty-five." About an hour later, Carlos called Pacorro again and asked for the name and phone number of the designated associate. Additional intercepted phone calls, warrants, surveillance, and investigation led to the eventual identification of this associate as co-defendant Ricardo Martinez.

Carlos told Pacorro that Martinez would get a call on behalf of "Naranjas" (Spanish for oranges). Carlos further said he would send Pacorro the serial number from a dollar bill for him to pass on to Martinez, and that a courier would meet Martinez and give him a dollar bill with the matching serial number. This is a common method that drug traffickers use to collect drug proceeds, with the serial number functioning as a token for the parties to know that they are meeting the correct person. Pacorro acknowledged that he and Martinez were familiar with this method.

Three minutes after that phone call, at 1:48pm, Pacorro received a text message from Martinez, using (313) 996-9452, that read "313 410 4297". Pacorro then called Martinez and confirmed that the serial number token should be sent to (313) 410-4297. Pacorro instructed Martinez to match it with the serial number on the dollar bill presented by Carlos's courier. They also agreed on nicknames for this operation, with Martinez being "blue shark" or "red shark" and Pacorro being "El Apache."

On November 20, 2019, DEA Phoenix agents obtained another search warrant from Maricopa County Superior Court for the location data for the phone that Martinez was using, (313) 996-9452. The GPS pings for that phone showed that it was located near 1298 Marvin Gaye Drive, Detroit, Michigan, which is part of a complex of townhomes and apartment buildings. The location data showed that phone was at this location during another previously intercepted call between Pacorro and Martinez. Pacorro stated that the courier was going to call that day to turn "that in," a suspected reference to drug proceeds. Martinez replied that he would check on the "letters" right now, which investigators had heard used as a reference to money on previous calls that led to seizures of cash. On additional intercepted calls, Martinez confirmed that he would be making the delivery the next day. Pacorro told him to be careful and take someone with him. Pacorro then gave Martinez the serial number token.

DEA Phoenix passed this information to DEA agents in Detroit, who set up surveillance outside of 1298 Marvin Gaye Drive around 10:45am on November 21, 2019. DEA Detroit agents saw a black Ford F-150 pickup truck park nearby, registered to M.W., a third party. Later, defendant Dwight Rashad arrived in his own Ford F-150 and walked toward 1298 Marvin Gaye Drive. At one point, Martinez and Rashad drove away together in Rashad's F-150, went to a house in Detroit associated with Martinez, and returned to 1298 Marvin Gaye Drive.

Around 4:00pm, DEA agents saw Rashad drive away and they contacted Michigan State K-9 Trooper David Bellestri. Trooper Bellestri followed Rashad and stopped him after observing that he had illegal window tint and failed to signal while changing lanes. Rashad consented to a search of his vehicle. Trooper Bellestri's K-9 Rex gave a positive indication for narcotics on a pair of work gloves in the driver door cupholder. Trooper Bellestri did not find any contraband during his search of the truck and released Rashad. Agents also saw Martinez leave 1298 Marvin Gaye Drive, drive away in M.W.'s F-150, and return around 4:50pm.

At 5:37pm, DEA Phoenix intercepted a call from Pacorro to Martinez. Martinez told Pacorro that he was just leaving for the drop off location. At 5:44pm, DEA Detroit agents saw Martinez and Rashad walking to M.W.'s F-150 and that Martinez was carrying a bag. They drove away, stopping briefly at a liquor store, but no one got in or out of the vehicle.

DEA Detroit agents contacted Trooper Bellestri again, who followed M.W.'s F-150 and pulled it over after observing it pass through a red light near Trumbell Street in Detroit around 5:53pm. Trooper Bellestri saw a leopard-print duffel bag on the back seat. He then told Martinez and Rashad to step out of the truck and asked them each some questions. Martinez claimed that he and Rashad were childhood friends, despite their nearly 20-year age difference. He said they had come from a friend's house but could not explain where they were going next. He also said he had lived in Detroit for four years and then changed it to two years. He could not explain where he worked, either. He denied owning the duffel bag, and Trooper Bellestri noted that he appeared nervous. Rashad, on the other hand, said they had only known each other for one to two years and that they had come from the liquor store, not a friend's house. He also denied having anything to do with the duffel bag. Trooper Bellestri thought that Rashad appeared nervous, short of breath, and stuttering, behaving altogether differently from the traffic stop a few hours earlier.

K-9 Rex alerted to the odor of narcotics on a duffel bag in the back seat. Inside the bag, Trooper Bellestri found rubber-banded bundles of U.S. currency wrapped in heat-sealed plastic bags, later counted at $285,060. Rashad was later indicted by a grand jury for conspiring with Martinez and others to possess with intent to distribute fentanyl. (ECF No. 1, Indictment).

II.     **Argument**

    **A. The MSP trooper had probable cause to stop Rashad after observing a traffic violation.**

"An ordinary traffic stop by a police officer is a 'seizure' within the meaning of the Fourth Amendment." *United States v. Blair*, 524 F.3d 740, 748 (6th Cir. 2008) (citing *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). "In order to effect a traffic stop, an officer must possess either probable cause of a civil infraction or reasonable suspicion of criminal activity." *United States v. Lyons*, 687 F.3d 754, 763 (6th Cir. 2012). Here, Trooper Bellestri had both.

An officer may legally conduct a traffic stop if he or she has probable cause to believe that a traffic violation occurred. *United States v. Hughes*, 606 F.3d 311, 315-16 (6th Cir. 2004). Rashad claims that he drove through a yellow light, though Trooper Bellestri described in his report that he observed Rashad drive through a red light near Trumbull Street, a violation of Michigan Compiled Law Section 257.612. The Court will have the opportunity to receive testimony from Trooper Bellestri and determine whether he had probable cause to stop Rashad. But the bar for probable cause in not high. *Kaley v. United States*, 571 U.S. 320, 328 (2014). Probable cause is defined as "reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990). In making a probable cause determination, a judge must "make a practical, common-sense decision whether, given all the

circumstances set forth in the affidavit before him, . . . there is a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). This standard "concerns probabilities, not hard certainties." *Brinegar v. United States*, 338 U.S. 160, 176 (1949); *United States v. Cortez*, 449 U.S. 411 (1981). Where the "facts and circumstances" are "sufficient to warrant a prudent person….in believing…. that the suspect has committed, is committing, or is about to commit an offense," the probable cause standard has been met. *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979).

Rashad argues that the stop was pretextual in violation of state law, but if an officer has probable cause for making a stop based on a traffic infraction, his motivations or subjective intentions are irrelevant. *Blair*, 524 F.3d at 748; see also *Bazzi v. City of Dearborn*, 658 F.3d 598, 604 (6th Cir. 2011) ("A traffic violation provides probable cause to justify a stop 'even if the officer's real purpose was a hope that narcotics or other contraband would be found as a result of the stop.'"). Here, an officer's observation of seeing a vehicle proceed through a red light was sufficient to initiate the traffic stop.

**B. Law enforcement had reasonable suspicion based on collective knowledge that a felony was being committed.**

More importantly, even if the traffic stop had not been supported by probable cause, law enforcement authorities had reasonable suspicion that Rashad and Martinez were engaged in illegal drug trafficking or related activity. With or

without a traffic infraction, law enforcement can stop a car when reasonable suspicion exists that the occupants have committed or are committing a felony. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 881 (1975). Reasonable suspicion is an even less demanding standard than probable cause. *Alabama v. White*, 496 U.S. 325, 330 (1990). Reasonable suspicion "requires more than a mere hunch, but is satisfied by a likelihood of criminal activity less than probable cause, and falls considerably short of satisfying a preponderance of the evidence standard." *United States v. Campbell*, 549 F.3d 364, 370-71 (6th Cir. 2008) (internal quotation marks omitted). In determining whether reasonable suspicion exists, the Court looks at the totality of the circumstances for a "particularized and objective basis for suspecting legal wrongdoing." *United States v. Arvizu*, 534 U.S. 226, 273 (2002) (internal quotation marks omitted). The question is not whether there is a possible innocent explanation for each of the factors, but whether all of them, taken together, give rise to reasonable suspicion that criminal activity may be occurring. *Id*. at 274-75.

Like probable cause, reasonable suspicion may be based on the collective knowledge of police officers. *United States v. Braggs*, 23 F.3d 1047, 1049 (6th Cir. 1994); *see also United States v. Redmond*, 475 Fed. Appx 603, 610 (6th Cir. 2013) ("The relevance of any individual piece of information gathered by law enforcement, cannot be measured in a vacuum, but rather must be viewed together

and in totality"). "Because officers "must often act swiftly [and] cannot be expected to cross-examine their fellow officers about the foundation of transmitted information," [courts] impute collective knowledge among multiple law enforcement agencies, even when the evidence demonstrates that the responding officer was wholly unaware of the specific facts that established reasonable suspicion for the stop." *Lyons*, 687 F.3d at 766 (quoting *United States v. Hensley*, 469 U.S. 221, 230-31 (1985)). Courts should evaluate whether (1) the officer taking the action acted in objective reliance on the information received; (2) the officer providing the information must have the facts supporting the level of suspicion required; and (3) the stop must be no more intrusive than would have been permissible for the officer requesting it. *Id*. at 767 (citing *United States v. Williams*, 627 F.3d 247, 252-53 (7th Cir. 2010)).

Trooper Bellestri stopped Rashad because DEA agents asked him to do so. As in *Lyons*, Trooper Bellestri was entitled to rely on the collective knowledge doctrine. The DEA agents collectively and reasonably suspected that M.W.'s F-150 contained evidence of a drug-trafficking related felony.[1] Based on the

---

[1] Rashad does not address the collective knowledge doctrine. DEA's request for assistance from Trooper Bellestri and the reasons for it were detailed in a DEA-6 Report of Investigation dated November 26, 2019. Upon reading Rashad's Motion to Suppress, government counsel determined that this report was missing from the discovery, obtained a copy of the missing report, and e-mailed it to Rashad's counsel on July 16, 2025. It was resent on July 25, 2025, to ensure delivery.

investigation detailed above, it was reasonable for DEA agents to suspect that either Martinez or Rashad was Pacorro's associate and that they were going to deliver drug money. Agents had listened to months of intercepted phone calls discussing similar transactions. They heard Pacorro and Martinez discuss specific plans in the days and even minutes leading up to the traffic stop, such as the amount of "two-eighty-five," their use of the characteristic token system, Pacorro's instruction for Martinez to bring a companion, and Martinez's statement that he was on his way to the delivery, followed by agents observing him carry a bag to M.W.'s F-150. Not more than 20 minutes after Martinez confirmed that he was on his way, DEA contacted a Michigan State Police K-9 Trooper to make the traffic stop, who in turn "possessed all the information [he] needed to act" on DEA's expectation that evidence would be found in the F-150. *Lyons*, 687 F.3d at 768–69.

    The collective knowledge provided by the DEA's investigation also provided probable cause for Trooper Bellestri's warrantless search of M.W.'s F-150 under the automobile exception. *United States v. Smith*, 510 F.3d 641, 647 (6th Cir. 2007); *United States v. Perkins*, 994 F.2d 1184 (6th Cir. 1993) (probable cause may be established through the collective knowledge of all officers). This was bolstered by Trooper Bellestri's own observation of the nervous behavior by Rashad and Martinez, their inconsistent answers, the duffel bag sitting on the back seat, and the alert of his K-9 Rex on it. As a general matter, "an alert by a properly

trained and reliable drug-detection dog is sufficient to establish probable cause for the presence of a controlled substance." *United States v. Winters*, 782 F.3d 289, 304 (6th Cir. 2015). Given the totality of the circumstances, law enforcement had probable cause to search M.W.'s F-150.

### C. Rashad's statements to Trooper Bellestri did not violation *Miranda*.

A defendant may not be "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. A suspect subject to custodial interrogation must be given notice of this right against self-incrimination. *Miranda v. Arizona*, 384 U.S. 436, 478–79 (1966). A suspect is "in custody" if, based on the totality of the circumstances, the restraint on his movement reaches the level associated with a formal arrest. *Berkemer v. McCarty*, 486 U.S. 420, 440 (1984).

The temporary, roadside detention and questioning of individuals during a traffic stop is not a custodial interrogation and does not implicate *Miranda*. *Berkemer*, 486 U.S. at 439–40. The Supreme Court analogized such questioning to a *Terry* stop, rather than a formal arrest. *Id.*; *see Terry v. Ohio*, 392 U.S. 1 (1968). Those stops are permissible when an officer has reason to suspect that a crime has been or will be committed. *Berkemer*, 486 U.S. at 439 (internal quotations and citations omitted). Though there is some pressure associated with a traffic stop, they are usually presumptively temporary, public, and conducted by only one or two officers, differing it from the more coercive and "police dominated"

interrogations that raise *Miranda* concerns. *Id.* at 438–39. Officers may ask "a moderate number of questions to determine [one's] identity and to try to obtain information confirming or dispelling the officer's suspicions." *Id.* at 439. The detainee is not obligated to respond and must be released if there is no arrest. *Id*.

Trooper Bellestri's interview of Rashad did not violate the Sixth Amendment or *Miranda*. Here, Trooper Bellestri asked Rashad and Martinez a moderate number of questions pertaining to their relationship, their purpose in traveling together, and who owned the leopard-print bag on the backseat. The questioning took place outside of their vehicle on a public street in Detroit by a solitary officer. While Rashad could not simply walk away, he was not restrained or in handcuffs, and was not arrested after the interview. *United States v. Swanson*, 341 F.3d 524, 529–30 (6th Cir. 2003) The basis for Trooper Bellestri's questions were, as described above, his own observations and the collective knowledge of the DEA agents who requested the traffic stop. Their inconsistent, suspicious answers gave Trooper Bellestri further reason to have his K-9 Rex sniff the vehicle, followed by his search of the F-150. Under these circumstances, Trooper Bellestri was not required to give a *Miranda* warning, and Rashad's statement should be not suppressed on that basis.

### III. Conclusion

Rashad's motion should be denied.

        Respectfully submitted,

        JEROME F. GORGON JR.
        United States Attorney

        s/*Thomas Franzinger*
        Assistant United States Attorney
        211 W. Fort Street, Suite 2001
        Detroit, MI  48226
        Phone:  (313) 226-9774
        E-Mail: Thomas.franzinger2@usdoj.gov

Dated:  August 5, 2025

## Certificate of Service

I hereby certify that on August 5, 2025, I electronically filed the United States' Response to Defendant's Motion to Suppress with the Clerk of the Court of the Eastern District of Michigan using the ECF system which will send notification of such filing to the following via electronic mail to all counsel of record.

s/<i><u>Thomas Franzinger</u></i><br>
Thomas Franzinger<br>
Assistant United States Attorney<br>
211 W. Fort Street, Suite 2001<br>
Detroit, MI 48226<br>
Phone: (313) 226-9774<br>
E-Mail: Thomas.franzinger2@usdoj.gov